IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TRACIE W. KELLEY                              CV. 08-468-MA

               Plaintiff,                    OPINION AND ORDER

    v.

MICHAEL J. ASTRUE,
Commissioner of Social
Security Administration,

               Defendant.


MAX RAE
P.O. Box 7790
Salem, OR 97303
(503)363-5460
            Attorney for Plaintiff

KARIN J. IMMERGUT
United States Attorney
BRITTANIA HOBBS
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
(503)727-1158
            Attorneys for Defendant


MARSH, Judge.

    Plaintiff Tracie W. Kelley brings this action for judicial

review of a final decision of the Commissioner of Social Security

denying her applications for disability insurance benefits (DIB)
under Title II and supplemental security income (SSI) benefits
under Title XVI of the Social Security Act, 42 U.S.C §§ 401-403,
1381-1383f.  This Court has jurisdiction pursuant to 42 U.S.C. §
405(g) and 42 U.S.C. § 1383(c)(3).

Plaintiff contends she became disabled on December 15, 1989.
Her claims were denied initially and on reconsideration.  The
Administrative Law Judge held a hearing on January 19, 2007 and
issued a decision on March 30, 2007, finding that plaintiff was
not disabled.  The Appeals Council denied plaintiff's request for
review on February 28, 2008.   The ALJ's decision therefore
became the final decision of the Commissioner for purposes of
review.

Plaintiff seeks an order from this court reversing the
Commissioner's final decision and remanding the case for
immediate payment of benefits.  For the reasons that follow, the
Court AFFIRMS the Commissioner's final decision.

## THE ALJ'S DISABILITY ANALYSIS

The Commissioner has established a five-step sequential
process for determining whether a person is disabled.  Bowen v.
Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520,
416.920.  Each step is potentially dispositive.  The claimant
bears the burden of proof at steps one through four.  See Tackett
v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  The burden shifts

to the Commissioner at step five to identify jobs existing in significant numbers in the national economy that the claimant can perform.  Id. at 1100-01.

Plaintiff alleges disability beginning December 15, 1989, when plaintiff was 27.  Since that time, plaintiff has been employed as a musician, seamstress, stocker and a sewing machine repair person and a sewing machine salesperson.  However, plaintiff's periods of employment were of such short duration and low monetary value that they did not qualify as substantial gainful activity.  At the time of the ALJ's decision, plaintiff was 45.  Plaintiff has completed high school and approximately one year of college.

At step one, the ALJ concluded that plaintiff has not engaged in substantial gainful activity since December 15, 1989. See 20 C.F.R. §§ 404.1520(b), 404.1517 et seq., 416.920(b), 416.971 et seq.

At step two, the ALJ concluded that the plaintiff had the following severe impairments:  Asperger's Syndrome, generalized anxiety disorder, and a rule out mathematics disorder.  See 20 C.F.R. §§ 404.1520©), 416.920©).

At step three, the ALJ concluded that plaintiff's impairments, or combination of impairments did not meet or medically equal a listed impairment.  See 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 414.926.

The ALJ assessed plaintiff's residual functional capacity (RFC) to include the inability to interact appropriately with the public, the inability to consistently engage in ongoing cooperative teamwork endeavors, the inability to maintain sufficient focus and attention to perform multiple tasks simultaneously, or to tolerate rapid, unexpected changes in the work setting.  The ALJ concluded that plaintiff's RFC does allow the performance of unskilled tasks.  See 20 C.F.R. §§ 404.1529, 416.929; SSR 96-4p, SSR 96-7p.

At step four, the ALJ concluded that plaintiff is unable to perform any past relevant work.  See 20 C.F.R. §§ 404.1565, 416.965.

At step five, the ALJ concluded that considering plaintiff's age, education, work experience, and RFC, jobs exist in the significant numbers in national economy that Plaintiff can perform.  See 20 C.F.R. §§ 404.1560©), 404.1566, 416.960©), 416.966.  Accordingly, the ALJ concluded that Plaintiff is not disabled under the meaning of the Act.

STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 U.S.C. §§ 405(g), 1383©); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  "Substantial evidence means more than a mere

scintilla but less than a preponderance; it is such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion." Id.    The court must weigh all the evidence,
whether it supports or detracts from the Commissioner's decision.
Id.; Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The
Commissioner's decision must be upheld, even if the evidence is
susceptible to more than one rational interpretation.  Andrews,
53 F.3d at 1039-40.  If the evidence supports the Commissioner's
conclusion, the Commissioner must be affirmed; "the court may not
substitute its judgment for that of the Commissioner." Edlund v.
Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001).

## THE RELEVANT RECORD

Plaintiff testified that she lives in rural Oregon with her
partner of eight years, Randall Hamme, two friends, and at least
occasionally, her sixteen year old daughter. (Tr. 352.) Plaintiff
testified that she rarely watches television or movies because
the constant flickering, brightness, and quick movements hurt her
eyes.  (Tr. 353.)  Plaintiff stated that the lights in the
hearing room hurt her eyes.  (Tr. 353.)  Plaintiff enjoys using
the internet to participate in groups and mailing lists about
autism and music as well as reading about autism.  (Id.)
Plaintiff reported minimal use of the telephone because she has a
difficult time understanding the words, and thus prefers to email
as a way of communicating.  (Tr. 354.)

Plaintiff described a typical day as follows:

> I wake up and I feed the cats and dogs and
> then I do the wood stove and then I drink
> Chai tea and listen to NPR and then I wash
> the dishes and then I usually work on the
> computer and doing email and news groups and
> working on my website for a few hours.  Then
> I have to stop and go outside and maybe get
> some more wood and then I might work on
> songs, writing songs in the afternoon and
> writing essays or answering questions.
> Parents email me with questions about
> Asperger's and I spend a lot of time
> answering that online.  (Tr. 354.)

Plaintiff testified that she dislikes leaving her home more than once or twice a week.  (Tr. 354.)  Plaintiff also dislikes riding in the car because of the fast movement, smells, noise and her fear of crashing.  (Tr. 354.)  According to Plaintiff, the smell of exhaust, chemicals and perfume give her instant migraine headaches.  (Tr. 355.) Plaintiff reported experiencing headaches five to six times a year, which is less frequent than her past history because she often stays in her home environment.  (Tr. 359.) Plaintiff reported that she is able to drive herself to places she knows well.  (Tr. 355.)  Plaintiff testified that she becomes overloaded with sights and sounds of new places, and wraps herself in a blanket or scarf and pulls her hat down to calm down.  (Tr. 355-56.)  Plaintiff stated that she can have a seizure if she becomes too overloaded by external stimuli.  (Tr. 356.)

Plaintiff also testified about playing music, singing and making recordings. (Tr. 356.) Plaintiff performs once or twice a month in the winter and three to four times per month in the summer. (Tr. 357.) Plaintiff testified that her partner gets everything set up for their performances, and that she is always excited to perform:

> And the minute I put my guitar on, I'm a whole different person. I'm large and in charge of my show and then when it's done, then it's usually pretty high and exciting and sometimes they even want me to go talk on the radio because after I've played I can do that. . . . And then I go home and usually the next day I just really can't do anything. It's, I can't focus on anything. It's just kind of a blank day. (Tr. 358.)

Plaintiff testified that she typically doesn't wear glasses when she performs in an effort to see and process fewer details. (Tr. 358.)

Plaintiff also testified that she and her partner Mr. Hamme drove to Philadelphia to speak and perform at an autism retreat in 2004. Plaintiff also reported doing a presentation at a local middle school about autism with assistance from her partner Mr. Hamme. (Tr. 360-61.)

Plaintiff described her past employment as an industrial seamstress in 2000. (Tr. 362.) Plaintiff testified that the lights and humming noises from the fluorescent lights and

machines distracted her, causing her to make mistakes.  (Tr. 363.)

<u>Randall Hamme's Testimony</u>

Randall Hamme, plaintiff's long term partner, testified at the hearing.  (Tr. 367.)  He stated that he had known plaintiff for approximately ten years, and lived with her for nine years. (Tr. 367.)  He described plaintiff as "incredibly smart and intelligent" and "phenomenally gifted in music."  (Tr. 368.)  Mr. Hamme testified that plaintiff's senses are more acute than other people's and that her sensitivity often becomes debilitating for her.  As a result, Mr. Hamme has structured their home to minimize unforeseeable stimulus.  (Tr. 368-69.)  He described their home as quiet, without fluorescent lights, and minimal motor noises.  He testified that they do not use strongly scented products in their home and warn each other of loud noises.  (Tr. 369.)  Mr. Hamme testified that their telephone ringer is off and the answering machine is low so that telephone calls can be collected and returned by him without any jarring noise.  (Tr. 369.)  Mr. Hamme testified that plaintiff can cook simple meals in the microwave for herself, as well as dress and groom herself, although she occasionally needs reminders to eat.  (Tr. 370, 373.)  Mr. Hamme also described that plaintiff works on a laptop computer because it is quieter and she can work without distractions.

Mr. Hamme testified that when he and plaintiff perform music together, he collects all the gear, loads it into the van, and sets up the equipment at the venue. (Tr. 372.) Mr. Hamme stated that plaintiff typically sits in the back of the van until it's time to get to the stage to perform. According to Mr. Hamme, he has taken extra care to ensure the musical set up and sound is exactly the same as it is at their home. (Tr. 372.)

Mr. Hamme also testified that when plaintiff experiences sensory overload, it arises from too much new stimulus. In those situations, Mr. Hamme described plaintiff as rocking back and forth, potentially stammering, losing speech, and eventually having a seizure if they cannot stop the stimulus. (Tr. 375-77.) Mr. Hamme testified that he has witnessed 15 to 20 seizures in the past ten years. (Tr. 378.)

    CDIU Investigation Report

Plaintiff's applications for disability benefits were referred to an investigator in the Cooperative Disability Investigations Unit (CDIU). (Tr. 316.) A CDIU investigator conducted an internet search which revealed that plaintiff plays bass guitar in a band called the Raventones with her partner Randall Hamme. The band's website listed a performance on March 19, 2005, which the investigator attended. The investigator arrived at the venue shortly before the scheduled start time of the event. (Tr. 316.) The investigator observed plaintiff and

Mr. Hamme set up and do sound checks.  As the audience filtered
in, the investigator observed plaintiff greet new arrivals.  The
audience consisted of approximately 24 people.  Plaintiff spoke
briefly from the stage with new arrivals and audience members.
(Tr. 317.)  While on stage, the investigator noted that plaintiff
sang in a professional manner and made comments to the audience.
The investigator described several visual distractions during the
performance:

> several rows of Christmas lights spread out
> in front of the stage, small round devices
> which flashed colored lights and were rolled
> around the floor by children, worn on their
> heads as they paraded in front of the
> performers and placed near the performers to
> create a strobe effect during a rock number.
> One of the children ran back and forth in
> front of the stage, jumping into a pile of
> cushions.  Another child had a flash camera
> and took several pictures of [plaintiff] and
> her partner from close range, about four to
> six feet away.  There was no sign that
> [plaintiff] was distracted by the children.
> The couple's music was loud but not
> deafening.  (Tr. 317.)

Following the performance, the investigator observed
plaintiff visiting with a few of the audience members.  (Tr.
317.)  The investigator also noted a couple of odd mannerisms off
stage, but otherwise observed no functional difficulties by
plaintiff. (Tr. 316-18.)

Dr. Charlotte Higgins-Lee

On August 3, 2004, Dr. Charlotte Higgins-Lee, an examining psychologist, performed a three and half hour assessment of plaintiff. (Tr. 222-27.) Mr. Hamme brought her to the evaluation and left when plaintiff was settled. (Tr. 224.) The assessment included a clinical interview and the administration of several IQ tests. (Tr. 222.)

Dr. Higgins-Lee described plaintiff as appearing frightened throughout the evaluation, and appeared anxious and withdrawn. Plaintiff did not make eye contact during the interview. During the interview, plaintiff made repetitive movements with her hands or shook her leg. While performing the mental status evaluation, plaintiff rubbed her nose repeatedly and opened and closed her fingers. (Tr. 225.)

During the interview, plaintiff asserted that she was on the autism spectrum, suffered from anxiety and suffered migraine headaches, caused by certain smells. (Tr. 223.) Plaintiff reported being bothered by certain sounds, such as humming and buzzing. (Tr. 222.)

Dr. Higgins-Lee diagnosed plaintiff with Asperger's Syndrome, generalized anxiety disorder and a rule-out mathematics disorder. (Tr. 226-27.) Dr. Higgins-Lee stated "there was no indication of exaggerated symptoms" and found that plaintiff could have communication problems in work situations. She

11 - OPINION AND ORDER

reported that plaintiff would have difficulty understanding instructions, and difficulty concentrating on more than one thing at a time. Dr. Higgins-Lee also found that social interaction and adaptability would be problems for plaintiff in a work situation. (Tr. 227.)

Dr. Bill Hennings

Dr. Bill Hennings, a reviewing psychologist, completed a Psychiatric Review Technique Form (PRTF) and a Mental Residual Functional Capacity assessment in October 2004. He concluded that plaintiff has Asperger's Syndrome and a generalized anxiety disorder. (Tr. 245, 252, 256.) He also concluded that plaintiff had mild limitations in activities of daily living, moderate limitations in social functioning, concentration, persistence, or pace, and no episodes of decompensation. (Tr. 257.) Dr. Hennings found moderate limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. 243-244.) Thus, Dr. Hennings concluded that plaintiff was capable of understanding and remembering short, simple instructions, and would be able to maintain concentration for up to two hours at a time. He also concluded that she would work best in a quiet environment with little to no public contact, limited co-worker contact and normal supervision. (Tr. 245.)

<u>Dr. Peter LeBray</u>

Dr. LeBray, a reviewing psychiatrist, reviewed plaintiff's disability application file and the CDIU report and completed a another PRTF. (Tr. 319-332.) Dr. LeBray concurred in the diagnoses of Asperger's Syndrome and generalized anxiety disorder and noted plaintiff's history of depression. Based on his review of her file, Dr. LeBray concluded that plaintiff suffered mild limitations in activities of daily living, social functioning, maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 329.) Dr. LeBray noted that the CDIU report was inconsistent with plaintiff's allegations. (Tr. 331.)

<u>Dr. David McGourty</u>

Dr. McGourty reviewed Dr. Higgins-Lee's evaluation of plaintiff, and visited with plaintiff in her home. Dr. McGourty did not perform any additional tests or assessments of plaintiff. He concurred with Dr. Higgins-Lee's diagnosis of Asperger's Syndrome, submitted a report, and testified at the hearing. (Tr. 268, 380.)

Dr. McGourty testified that stimulus control is very important for persons with Asperger's and autism. (Tr. 383.) He also testified that hypersensitivity to sights, sounds and smells is almost a diagnostic criteria for persons with Asperger's. (Tr. 384.) Dr. McGourty also stated that plaintiff might need to

have a supervisor repeat instructions in different ways in order
to understand.  (Tr. 387.)

<u>ISSUES ON REVIEW</u>

On appeal to this court, Plaintiff contends that the ALJ
failed to properly credit her testimony and that of other
corroborating witnesses when assessing her credibility.
According to Plaintiff, that testimony should be credited as true
and benefits should be awarded.  Plaintiff argues that the ALJ's
RFC assessment fails to include all the limitations established
in the record and that the RFC erroneously provides that she can
perform unskilled tasks.  Plaintiff also contends that she meets
the "B" criteria for mental listings under 12.02, 12.06, and
12.10, and thus is disabled under the Act.  Lastly, plaintiff
argues that the ALJ's hypothetical to the vocational expert at
Step Five failed to include all the limitations established in
the record, and therefore the Commissioner failed to meet its
burden at Step Five.

<u>DISCUSSION</u>

1.    <u>Plaintiff's Adverse Credibility Determination.</u>

According to Plaintiff, the ALJ failed to provide clear and
convincing reasons for rejecting her testimony about the degree
to which she is limited by her impairments.  I disagree.

In deciding whether to accept subjective symptom testimony
about a claimant's alleged disability, such as pain or

depression, an ALJ must perform two stages of analysis. 20 C.F.R. §§ 404.1529, 416.929. The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996). Here, there is no dispute that plaintiff presented objective medical evidence in support of her claim of Asperger's Syndrome, generalized anxiety disorder and a rule out mathematics disorder which could reasonably be expected to produce some anxiety, isolation, and sensory overload. (Tr. 42.)

At the second stage of the credibility analysis, assuming there is no affirmative evidence of malingering, the ALJ must provide clear and convincing reasons for discrediting the claimant's testimony regarding the severity of the symptoms. Smolen, 80 F.3d at 1284; see also Morgan v. Apfel, 169 F.3d 595, 599 (9th Cir. 1999); Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995). Clear and convincing reasons may include medical evidence tending to discount the severity of the claimant's subjective claims. Smolen, 80 F.3d at 1283. The ALJ may consider the claimant's daily activities, work record, and the observations of physicians

and third parties with personal knowledge of the claimant's
functional limitations.  Smolen, 80 F.3d at 1284; SSR 96-7p, 1996
WL 37186.

At the hearing, Plaintiff testified that she is unable to
work and that she is bothered by smells and noises that are often
undetected by others, and that she can experience sensory
overload.  However, the ALJ concluded the intensity, persistence
and limiting effects of these symptoms were not as severe as she
alleged.

Here, the ALJ identified numerous reasons, citing specific
record evidence for discrediting plaintiff.  For example, the ALJ
cited inconsistencies between plaintiff's assertion that she is
unable to work and her level of daily activities.  The ALJ
considered plaintiff's description of a typical day during her
evaluation with Dr. Higgins-Lee in August 2004, in which she
detailed using the computer, "cleaning chores, washing the dishes
and the laundry, vacuuming, taking care of her pets, and
performing yard work."  The ALJ also considered plaintiff's
hearing testimony in which she reported a host of similar daily
activities in addition to playing instruments, singing, recording
music, and performing on stage.  (Tr. 42.)  Where a claimant
spends a substantial part of his or her day "engaged in pursuits
involving the performance of physical functions that are
transferable to a work setting," findings as to these

contradictions are an appropriate basis upon which to discredit a claimant's testimony.  <u>Morgan</u>, 169 F.3d at 600; <u>Thomas v. Barnhart</u>, 278 F.3d 947, 959 (9th Cir. 2002); <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989).

The ALJ also noted the inconsistency between plaintiff's assertion that she is unable to interact with people and her testimony about traveling to Philadelphia to make a presentation at an Autism retreat, as well as giving another presentation to a local middle school.

The ALJ also fairly discredited plaintiff based on the inconsistency between her asserted functional limitations and her behavior during the musical performance detailed in the CDIU report.  In that report, the investigator offered his observations of plaintiff and Mr. Hamme setting up for and giving a musical performance.  The investigator reported that Plaintiff and her partner greeted arrivals, did sound checks, made comments to the audience and performed in a professional manner.  The investigator observed plaintiff chatting with newcomers in the audience.  The ALJ noted the numerous visual distractions detailed in the report, such as flashing lights, a flash camera, and running children, which were inconsistent with plaintiff's allegations of being bothered by flickering lights and visual stimuli.  The ALJ clearly found the CDIU report persuasive:

> The final paragraph of this report . . .
> provides a clear indication of the
> inconsistency between the claimant's
> allegations and her actual behavior:
>
> "While she did display occasional nervous
> mannerisms offstage, she also displayed
> behavior she reports she is incapable of,
> such as interacting with the audience and
> tolerating flashing lights and other visual
> stimuli.  She displayed no abnormalities or
> signs of distraction during her performance."
> (Tr. 43.)

Tellingly, Plaintiff does not challenge the validity or accuracy of the CDIU report.  Here, the ALJ has articulated clear and convincing reasons to support the adverse credibility finding.  "Where, as here, the ALJ has made specific findings, justifying a decision to disbelieve an allegation . . .  and those findings are supported by substantial evidence in the record, our role is not to second guess that decision."  <u>Fair</u>, 885 F.3d at 604.

2.   <u>Lay Testimony of Mr. Hamme.</u>

Plaintiff contends that the ALJ failed to properly account for the testimony of Mr. Hamme.  Lay witness testimony as to a claimant's symptoms or how an impairment affects his or her ability to work is competent evidence, which the ALJ must take into account.  <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001); <u>see also</u> <u>Dodrill v. Shalala</u>, 12 F.3d at 919; <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996).  The ALJ is required to

account for competent lay witness testimony, and if he rejects
it, provide germane reasons for doing so. <u>Lewis</u>, 236 F.3d at
511.

The ALJ summarized his findings concerning Mr. Hamme as
follows:

>       Mr. [Hamme] reported that the claimant is a
> phenomenal reader who retains everything. He
> also described her as smart and intelligent
> and a phenomenon in music.
>
>       He also reported that she had sensory
> problems in which she was unable to block
> things out, thereby making it difficult for
> her to concentrate on just one thing.
> Reportedly, he observed 15 to 20 seizures by
> the claimant over the time that he has known
> her. Mr. [Hamme] also reported that the
> claimant was not 'the most hygienic' and that
> she needed cues to remember to eat.
>
>       His testimony, however, did not provide
> information that indicates that the
> previously discussed 'RFC' is an inaccurate
> description of the claimant's abilities. Mr.
> [Hamme] recognized the many talents and
> skills that the claimant possessed. While he
> indicated problems with concentration and
> hygiene and the need for cues, these deficits
> have not prevented the claimant [from]
> working as a performer or in making
> presentation[s] to varied audiences
> concerning autism and Asperger's Syndrome.
> His testimony has led to the conclusion that
> the claimant can perform successfully within
> the limitations listed in the residual
> functional capacity. (Tr. 43.)

According to plaintiff, the ALJ did not adequately address
her sensory overload, her sensitivity to sudden noises and

19 – OPINION AND ORDER

smells, or her need for a structured environment as described by Mr. Hamme.

It is obvious from the ALJ's detailed findings that Mr. Hamme's testimony was considered carefully. It is clear that Mr. Hamme's testimony was not rejected, but to a large degree was reflected in the RFC, notably plaintiff's inability to tolerate rapid changes in the work setting. To the extent Mr. Hamme's testimony is construed to describe debilitating sensitivity to sensory stimulation, it was largely corroborative of plaintiff's testimony, which the ALJ deemed less than credible. Where the evidence supports the Commissioner's findings, it is not for this court to substitute its judgment for that of the Commissioner. Edlund v. Massanari, 253 F.3d at 1156.

3.    Dr. McGourty's Opinion Evidence.

To reject the uncontroverted opinion of a treating or examining physician, the ALJ must present clear and convincing reasons for doing so. Rodriquez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989); Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005). If a treating or examining doctor's opinion is contradicted by another doctor's opinion, it may be rejected by specific and legitimate reasons. Bayliss, 427 F.3d at 1216. When evaluating conflicting opinions, an ALJ is not required to accept an opinion that is not supported by clinical findings, or is brief or conclusory. Id.

Dr. McGourty met with plaintiff and Mr. Hamme in their home and took a full history of plaintiff's conditions.  He examined the assessment performed by Dr. Higgins-Lee, but performed no additional tests.  Dr. McGourty submitted a report in which he stated that due to plaintiff's hypersensitivity to stimuli, it would be difficult for her to maintain gainful employment.  (Tr. 271.)  Dr. McGourty also testified at the hearing.

Here, the ALJ relied on information from Dr. McGourty in making the RFC assessment.  The ALJ considered Dr. McGourty's testimony that "people with autism do not pick up on social nuances" and need a setting with "precise stimulus control."  (Tr. 41.)  The ALJ also noted the following concerning Dr. McGourty:

> Dr. McGourty . . . did not do testing of the claimant.  His comments seemed more focused on what is typical for Asperger's in general than on the claimant's limitations or capacities.  He stated that his heart goes out to individuals with this disorder.  From his testimony, it does not appear that he tested or evaluated the claimant and his comments were not useful in assessing the claimant's specific capacities. (Tr. 43.)

In this case, the ALJ provided specific and legitimate reasons for according Dr. McGourty's opinion little weight.  Dr. McGourty's report was based, at least in part, upon a singular meeting with plaintiff and Mr. Hamme.  Where the claimant's subjective complaints have been discounted, an ALJ may disregard

a medical opinion premised on those subjective complaints.
Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001);
Bayliss, 427 F.3d at 1217;  Morgan, 169 F.3d at 601 ("A
physician's opinion of disability 'premised to a large extent
upon the claimant's own accounts of his symptoms and limitations'
may be disregarded where those complaints have been 'properly
discounted.'" quoting Fair, 885 F.2d at 605).

Contrary to plaintiff's assertions, it is clear from the
ALJ's decision that Dr. McGourty's testimony was considered.  In
essence, plaintiff asks this court to re-weigh that evidence.
This court may not do so.  Having reviewed the full testimony and
detailed report of Dr. McGourty, the ALJ's determination that
much of them relates to persons with Asperger's Syndrome in
general and contains little relating to plaintiff's specific
capabilities for the relevant time period is supported by
substantial evidence.  The ALJ has provided specific and
legitimate reasons, supported by substantial evidence in the
record, for giving his opinion less weight.

4.    Plaintiff's RFC.

The RFC assessment describes the work-related activities
that a claimant can do on a sustained, regular and continuing
basis, despite the functional limitations imposed by his or her
impairments.  20 C.F.R. §§ 404.1545(a), 416.945; SSR 96-8p, 1996
WL 374184.  The RFC assessment must be based on all the evidence

in the record, and the ALJ must consider all the allegations of
limitations and restrictions.  SSR 96-8p, 1996 WL 374184, *5.

Here, the ALJ determined that plaintiff's RFC "includes the
inability to interact appropriately with the public, to
consistently engage in ongoing cooperative teamwork endeavors, to
maintain sufficient focus and attention to perform multiple tasks
simultaneously, or to tolerate rapid unexpected changes in the
work setting."  The ALJ found plaintiff remains capable of
performing unskilled tasks.

Plaintiff's argument that the ALJ "usurped" the role of the
vocational expert in determining that plaintiff is capable of
performing unskilled tasks misses the mark.  Plaintiff argues
that her ability to perform unskilled tasks is a vocational
judgment to be reserved to the vocational expert.

Plaintiff seemingly conflates the roles of the ALJ and the
vocational expert.  When making the RFC determination, the ALJ
must, as he did here, determine whether plaintiff can perform
unskilled work.  SSR 85-15.  It is the ALJ's role to make a
determination of what types of work the claimant can perform, if
any, and then to set forth those factual scenarios to the
vocational expert.  SSR 96-5p.  Then it is the vocational
expert's role to turn those "factual scenarios into realistic job
market probabilities."  Sample v. Schweiker, 694 F.2d 639, 643
(9th Cir. 1982).  Plaintiff's reliance on SSR 96-9p is misplaced.

That ruling pertains to individuals with an RFC of "less than a full range of sedentary work." Plaintiff's RFC contains no exertional restrictions limiting her to sedentary work.

5.    Plaintiff Did Not Meet the Listings under Part B.

A claimant has the burden to establish that he or she meets or equals the criteria for a listed impairment based on medical evidence. Tackett v. Apfel, 180 F.3d at 1100. When dealing with alleged mental disabilities, the inquiry has two parts. In the first part (Part A), the ALJ must determine whether there is evidence to medically substantiate the presence of a mental disorder. In the second part (Part B), the ALJ must determine whether the severity of the claimant's functional limitations are "incompatible with the ability to work." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. Schneider v. Comm'r of the Soc. Sec. Admin., 223 F.3d 968, 974-75 (9th Cir. 2000). The ALJ must assess the severity of claimant's impairments (none, mild, moderate, marked or extreme) in the categories of activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C. Part B of the Listing is met if claimant's functional limitations are marked or extreme in at least two of the four categories. Id. at § 12.04B.

Plaintiff argues that when the testimony of plaintiff, Mr. Hamme and Dr. McGourty is properly considered, plaintiff's

functional limitations are marked and she thus meets Part B of the Listings under 12.02, 12.06, and 12.10.  Plaintiff also contends that the ALJ failed to consider her ability to function outside of her structured home environment.

Here, the ALJ determined that plaintiff did not have marked or extreme functional limitations, finding instead that plaintiff's limitations are moderate in each category.  The ALJ's findings are adequately supported by substantial evidence in the record.  The ALJ indicated that he relied upon the PRTF supplied by Dr. Hennings.  An examination of Dr. Hennings' PRTF reveals that he found plaintiff mildly restricted in the activities of daily living, moderately restricted in maintaining social functioning, and moderately restricted in maintaining concentration, persistence, and pace, with no episodes of decompensation.  (Tr. 257.)  Indeed, Dr. Hennings found no marked or extreme limitations in *any* category.

Further, as discussed above, the ALJ's decision reveals that he carefully considered Mr. Hamme's testimony and that of Dr. McGourty.  Although the discussion is not contained in the section discussing the listings, it is clear that the ALJ considered the testimony within the decision as a whole.  See Lewis v. Apfel, 236 F.3d at 513 (an ALJ is required to discuss and evaluate evidence that supports his conclusion at Step Three; the ALJ is not required to do so under a particular heading); cf.

<u>Schneider</u>, 223 F.3d at 975 (reversing because lay testimony was excluded from consideration of Part B determination).

Plaintiff's contention that the ALJ failed to consider the effect of her structured home environment is somewhat specious. The ALJ discussed plaintiff's "highly supportive living arrangement" and her ability to "function independently outside her home" in determining that she failed to meet the alternative "C" criteria. Plaintiff assigns no error to that portion of the ALJ's decision, nor is there any evidence in the record which would satisfy the "C" criteria. The Commissioner's decision must be upheld, even if the evidence is susceptible to more than one rational interpretation. <u>Andrews</u>, 53 F.3d at 1039-40; <u>Tackett</u>, 180 F.3d at 1097.

6.   <u>The Commissioner Met its Burden at Step Five.</u>

At step five of the sequential evaluation, the burden shifts to the Commissioner to establish that there are jobs in the national economy that the claimant can do. <u>Andrews</u>, 53 F.3d at 1043. The Commissioner can satisfy this burden by eliciting testimony from a vocational expert (VE) to determine whether jobs exist in the national economy that the claimant can perform despite his limitations and restrictions. <u>Tackett</u>, 180 F.3d at 1103-04. The hypothetical posed to the VE must accurately reflect all of the claimant's limitations established in the record. <u>Bayliss v. Barnhart</u>, 427 F.3d at 1217.

Plaintiff contends that because the RFC included plaintiff's ability to perform unskilled tasks, the hypothetical posed to the VE was erroneous.  I have found no error in the ALJ's RFC assessment, and plaintiff's argument on this point fails.

The RFC finding and the hypothetical posed to the vocational expert included those limitations supported by substantial evidence in the record.  These limitations were those that the ALJ found to be credible and supported by substantial evidence in the record.  It was proper for the ALJ to rely on the VE's answer.  Id. at 1217-18.

CONCLUSION

For the reasons stated above, the Commissioner's final decision is AFFIRMED, and this action is DISMISSED.

IT IS SO ORDERED.

DATED this _29_ day of January, 2009.


                              _/s/  Malcolm F. Marsh_____
                              Malcolm F. Marsh
                              United States District Judge